USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: October 23, 2017

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
:
CAPITAL LOGISTICS, LLC, :
:
Plaintiff, :
: 16-cv-8594 (KBF)
-v- :
: OPINION & ORDER
GRAY TRANSPORTATION, INC., :
:
Defendant. :
:
------------------------------------------------------------X

KATHERINE B. FORREST, District Judge:

This is a straightforward case alleging a breach of a carriage contract involving the shipment of 27 to 28 pallets of strawberries. When the strawberries arrived at their destination, they were rejected by the buyer because their pulp temperature exceeded specifications. This lawsuit followed.

Before the Court are the parties' dueling motions for summary judgment. (ECF Nos. 23, 27.) In most cases alleging breach of a carriage contract, the Court can in fact resolve the dispute on summary judgment, avoiding the need for an expensive trial proceeding. This, however, is not one of those cases. Here, as discussed below, there are triable facts with regard to (1) the condition of the strawberries at the time they were delivered by the shipper to the carrier, and (2) whether the shipper engaged in negligent acts that relieve the carrier of liability for the loss. While the amount in controversy is less than $100,000 and there are serious questions as to whether it is worth incurring the expense of a trial, this

Court is unable to resolve this dispute on the motions before it. Both motions to dismiss are DENIED.

I. LEGAL PRINCIPLES

A. Summary Judgment Standard

Summary judgment may be granted when a movant shows, based on admissible evidence in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In reviewing a motion for summary judgment, the Court construes all evidence in the light most favorable to the nonmoving party, and draws all inferences and resolves all ambiguities in its favor. Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010). The Court's role is to determine whether there are any triable issues of material fact, not to weigh the evidence or resolve any factual disputes. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).

B. Carmack Amendment

The Carmack Amendment governs the terms of bills of lading issued by domestic rail carriers. See 49 U.S.C. § 11706(a)(5). Carmack imposes liability for damage caused during the rail route under the bill of lading against "receiving rail carrier[s]" and "delivering rail carrier[s]," irrespective of which caused the damage. 49 U.S.C. § 11706(a). "Carmack's purpose is to relieve cargo owners of the burden of searching out a particular negligent carrier from among the often numerous

2

carriers handling an interstate shipment of goods." Kawasaki Kisen Kaisha Ltd. v. Regal-Beloit Corp., 561 U.S. 89, 90 (2010) (quotation omitted). It is undisputed that Carmack applies to motor carriers in addition to rail carriers. Royal & Sun Alliance Ins., PLC v. Ocean World Lines, Inc., 612 F.3d 138, 145 (2d Cir. 2010).

      C. Prima Facie Liability

To establish a prima facie case of liability against a carrier under the Carmack Amendment, the shipper must prove both (1) delivery of the goods to the initial carrier in good condition, (2) damage prior to arrival at the destination, and (3) the quantum of damages or loss. See Sec. Ins. Co. v. Old Dominion Freight Line, Inc., 391 F.3d 77, 81, 83 (2d Cir. 2004); see also Atl. Mut. Ins. Co. v. CSX Lines, LLC, 432 F.3d 428, 433 (2d Cir. 2005) (citing Transatl. Marine Claims Agency, Inc. v. M/V OOCL Inspiration, 137 F.3d 94, 98 (2d Cir. 1998)). Although the issuance of a clean bill of lading is typically prima facie evidence of receipt of the goods described, "where the contents of a shipment are not visible or open for inspection, as may be the case when cargo is transferred to the carrier in a sealed container, a clean bill of lading is not sufficient to establish delivery of the goods in good condition." Sec. Ins. Co., 391 F.3d at 83; see also Bally, Inc. v. M.V. Zim Am., 22 F.3d 65, 69 (2d Cir. 1994) (holding that it does not constitute such prima facie evidence "of the condition of the goods shipped in sealed packages where the carrier is prevented from 'observing the damaged condition had it existed when the goods were loaded.'" (quoting Caemint Foods Inc. v. Brasileiro, 647 F.2d 347, 352 (2d Cir. 1981))). In the case of a sealed container, the shipper must present evidence other

3

than the clean bill of lading to demonstrate that the goods were delivered to the carrier in good condition. Bally, Inc., 22 F.3d at 69; Sec. Ins. Co., 391 F.3d at 84 ("[W]hen a carrier is prevented from independently inspecting cargo, the plaintiff must present additional evidence, either direct or circumstantial, in order to establish the initial contents and condition of the cargo.").

Only after the plaintiff has established a prima facie case does the burden shift to the carrier to prove one of the exceptions to liability. Atl. Mut. Ins. Co., 432 F.3d at 433. Those defenses include where the alleged loss or damage arose from "act or omission of the shipper or owner of the goods or their agent," or where the loss or damage arose from "insufficiency of package." 46 U.S.C. §§ 30706(b)(6)-(7); see also Mo. Pac. R.R. Co. v. Elmore & Stahl, 377 U.S. 134, 137 (1964); Imperial Veal & Lamb Co. v. Caravan Refrigerated Cargo, Inc., 554 F. Supp. 499, 501 (S.D.N.Y. 1982).

> To support shipper liability, the burden is on
>
> the carrier to prove that the loss or damage arose solely from one or more of the excepted causes, and it is of no avail to it to show that the shipper was in any way negligent, if the loss or damage would not have occurred, except for the concurring fault of the carrier.

Lehigh Valley R. Co. v. State of Russia, 21 F.2d 396, 405 (2d Cir. 1927).

Plaintiff argues that the legal standard prevents the imposition of shipper liability, even if it set the temperature of the reefer at the wrong level and on the wrong cycle (see discussion below for facts on this point). According to plaintiff, defendant has a non-delegable "duty to ensure that the temperature of the reefer was properly set"—even if the shipper's personnel initially set the temperature and

4

cycle of the reefer, the defendant carrier was independently responsible to confirm that they had been set appropriately. (Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ. J. ("Pl. Mem. in Opp.") (ECF No. 31) at 15-16 (citing Project Hope v. M/V IBN Sina, 96 F. Supp. 2d 285, 295-96 (S.D.N.Y. 2000), aff'd, 250 F.3d 67 (2nd Cir. 2001)).) In support of this proposition, plaintiff cites the lower court and appellate decision for Project Hope v. M/V IBN Sina: 96 F. Supp. 2d 285 (S.D.N.Y. 2000) and 250 F.3d 67 (2d Cir. 2001). A review of these cases—and the cases cited therein—make it clear that plaintiff has overstated this argument.

As an initial matter, the Second Circuit did not, as plaintiff's citation indicates, affirm a holding of the lower court relating to the legal proposition on which it relies. Rather, the Second Circuit affirmed on a different basis. With regard to plaintiff's argument regarding "non-delegable duty to provide a [reefer] suitable for the intended transportation," (see Pl. Mem. in Opp. at 15), the Second Circuit stated that it was "unpersuaded." Project Hope, 250 F.3d at 78. The cases cited by the district court in Project Hope—Martin Imports v. Courier-Newsom Exp., Inc., 580 F.2d 240 (7th Cir. 1978), and Watson Bros. Transp. Co. v. Feinberg Kosher Sausage Co., 193 F.2d 283 (8th Cir. 1951)—also do not stand for the broad proposition plaintiff asserts. Both of those cases recite the legal standard for negligence, and that the carrier must not fail to exercise ordinary care. Martin Imports also cites the provision of the Carmack Amendment, 49 U.S.C. § 316(b), that requires every carrier to "provide safe and adequate service, equipment, and facilities for the transportation of property . . . ." 580 F.2d at 244. This Court does

5

not read either case as setting forth a legal requirement that if a shipper presets the temperature and cycle for refrigeration of goods (as defendant asserts occurred here), the carrier must change those settings or face sure liability.

II. FACTS NECESSARY FOR RESOLUTION OF THE CASE

As this Court finds triable issues of fact, it does not here set forth all facts relevant to the dispute between the parties and necessary to resolution of the case. Instead, it focuses on those facts that illuminate the existence of material, triable issues: whether the strawberries were delivered in good condition, and whether the shipper engaged in conduct supporting an "act of shipper" defense.

On January 28, 2016, three trailers, each containing 27 to 28 pallets of picked strawberries, arrived at the premises of the shipper, Amex Distributing Company ("Amex" or the "Shipper"), in Donna, Texas. (Pl.'s Mem. of Law in Supp. of Pl.'s Cross-Mot. for Summ. J. ("Pl. Mem. in Supp."), app. A2 (ECF No. 24-2) ("Receiving Reports").) The strawberries had been grown and harvested in Mexico. (Id.; Decl. of Barry Gutterman in Supp. of Def. Gray Transp.'s Mot. for Summ. Judgment, Ex. F (ECF No. 28-5) ("West Decl.") at 2.) Amex prepared a bill of lading for further carriage of 27 to 28 of these pallets to a Wal-Mart in Auburn, Illinois. (Id., Ex. G (ECF No. 28-5) ("Ellis Decl.") at 27.)

The driver for Gray Transportation, Ken Ellis, arrived on January 28, 2016. (Id.) Plaintiff provided evidence that Amex's normal practice is to allow drivers onto the loading dock, (Pl. Mem. in Supp., Ex. 2 (ECF No. 24-8) ("Renteria Decl.") ¶ 6), but Ellis has stated that he was not allowed on the loading dock to watch the

6

pallets being loaded into the refrigerated trailer (also referred to as a "reefer"), (Ellis Decl. ¶¶ 5-6). As such, even though the bill of lading recites that the strawberries were delivered in good condition, (Gutterman Decl., Ex. A (ECF No. 28-1) ("Bill of Lading") at 2), Ellis stated that he was not able to confirm this (Ellis Decl. ¶¶ 5-6). Thus, there is a triable issue as to the condition of the goods at loading.

There is an additional question of fact: whether other acts of the Shipper caused the loss. Defendant argues it is entitled to the "act of the shipper" defense.[1] (Def. Gray Transp., Inc.'s Mem. of Law in Supp. of its Mot. for Summ. J. ("Def. Mem. in Supp.") at 27.) According to defendant's expert Patrick Brecht, strawberries naturally give off heat and should therefore reasonably have been expected to do so here. (Gutterman Decl., Ex. E ("Brecht Decl.") at 7.) Refrigeration during transport was therefore not only prudent but necessary. According to Brecht, such refrigeration should have been continuous in order to ensure proper pulp temperature at the destination. (Id. at 9.) He also states that sources of heat transfer or heat retention should be avoided. (Id. at 7.)

There is no evidence that Ellis was instructed to pre-cool the reefer by the bill of lading or by Amex personnel. Nor is there evidence that he received direction regarding the temperature at which the strawberries should be maintained during carriage. These facts alone do not, however, establish shipper liability. Based upon

---

[1] As there is a triable issue with regard to the condition of the goods at delivery, the Court may only resolve this case on summary judgment if there is no triable issue on this defense. In the absence of a triable issue on the facts proposed by the defendant, the defendant would prevail. As set forth here, there is a triable issue with regard to the defense as well.

Brecht's statements, the carrier knew or should have known that some refrigeration was required. The next question is thus whether an adequate level of refrigeration was provided and, if not, which party is responsible.

The level of refrigeration during transit thus takes on importance. There is no dispute that the "Carrier Shipment Confirmation" indicates that the reefer had to be set on the "continuous" cycle. (Def. Mem. in Supp. at 10.) The parties dispute who in fact set the reefer's temperature and cycle for refrigeration. According to Amex, its normal practice was also to have the driver set the temperature control (both in terms of temperature level and cycle) for the reefer. (Renteria Decl. ¶ 7.) Ellis, the driver for the carrier stated that Amex personnel set the temperature and cycle.[2] (Ellis Decl. ¶ 6.) Both parties agree that the temperature was set to 34 degrees Fahrenheit but both also agree that the temperature cycle was set to "start-stop" rather than continuous. (Id.; Pl. Mem. in Supp., Ex. 3 ("Bange Decl.") at 2.) There appears to be agreement that the "start-stop" setting was incorrect and, given the nature of the product, the cycle should have been "continuous." There is no disagreement that the inaccurately set cycle likely contributed to the excessive pulp temperature when the goods arrived in Illinois on February 1, 2016.

There is evidence in the record, by way of Ellis's declaration, that he checked the temperature reading of the reefer on a regular basis throughout the trip and that the gauge never exceeded 34 degrees Fahrenheit. (Ellis Decl. ¶ 9.) Upon

---

[2] Defendant asserts that plaintiff's "routine practice" evidence is not sufficient to rebut the firsthand evidence of Ellis. That is legally incorrect. The evidence of a company's practice may be received into evidence if it is relevant (here, it is), and probative of whether a person acted in conformity with that routine practice (here, it is). Issues as to the relative value of firsthand evidence versus practice evidence goes to weight—not to admissibility.

8

tender on February 1, 2016, Wal-Mart noted that the temperature of the reefer was set to 34 degrees Fahrenheit, and that the actual temperature of the reefer was 34 degrees Fahrenheit. (Decl. of Carl Pezold in Supp. of Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ. J. ("Pezold Decl."), Ex. D.)

The reefer contained a "TempTale" temperature recorder. (Bange Decl. at 2.) The data from that recorder indicates that the temperatures in the reefer cycled between 39.6 degrees Fahrenheit and 53.5 degrees Fahrenheit. (Id.) Throughout the trip, the temperature cycled throughout that range, eventually steadying between 48-50 degrees Fahrenheit for the latter part of the trip. (Id. at 2.) The evidence supports a consistent temperature in the 40s. (Id.) The parties agree that the temperature should have been maintain near to or below 41 degrees Fahrenheit. (Brecht Decl. at 26; Pezold Decl., Ex. D.) There is also evidence in the record that the reefer was in working order both before and after carriage of the shipment at issue. (Def. Mem in Supp. at 3.)

When the strawberries were tendered to Wal-Mart, which rejected them as having an excessive pulp temperature, there were signs of mold. (Brecht Decl. at 33; Pezold Decl., Ex. 1-B; see also Pezold Decl., Ex. D.) According to Brecht, the presence of mold indicates the temperature issues between the time of harvesting and receipt. (Brecht Decl. at 33.) An inspector also found signs of moisture on the plastic sheet covering the product. (Pezold Decl., Ex. 1-A (ECF 33-1) at 2.))

The uncontroverted evidence reveals the use of pallet covers over the strawberries; defendant's expert, Brecht, opines that the use of pallet covers would

9

have resulted in a retention of heat, causing an increase in pulp temperature. (Brecht Decl. at 31.) Brecht does not, however, separate the impact of this from the other factors that could or would have impacted the pulp temperature. Thus, the fact that this evidence is uncontroverted is insufficient to allow the Court to grant summary judgment on the "act of shipper" defense to defendant.

III. CONCLUSION

This is not a big case. Indeed, it is a case where only a modest loss is at issue. Nevertheless, on the facts that have been developed in the record, the Court determines that there are triable issues as to whether the strawberries were in good condition at the time of delivery to the carrier, and whether the carrier has an "act of shipper" defense.

To finally resolve this case the parties have two choices: (1) consent to a trial on the papers that would allow the Court to weigh the evidence, or (2) a bench trial. A bench trial has been set for December 12, 2017, and if the case is to be tried live, it shall be tried then. The parties shall confer on the format of the disposition (on the papers, or a live trial), and, not later than November 3, 2017, notify this Court in writing of their position(s).

SO ORDERED.

Dated:     New York, New York
           October 23, 2017

                                        KATHERINE B. FORREST
                                        United States District Judge